### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JESSIE FIELDS, LOOKMAN SULAIMON, PATRICIA JOHNSON, FELICIA NOEL, FRANCISCO NIEVES, LAKYSHA ALLEN, YOLANDA THOMAS, YVONNE LANE, CHERI ROACH, DAVID BELL, ROSE MIDDLETON, and THANIA ACOSTA<br><br>                          Plaintiffs,<br><br>          -against-<br><br>GREGORY RUSS, as Chair and Chief Executive Officer of the New York City Housing Authority, and the NEW YORK CITY HOUSING AUTHORITY,<br><br>                          Defendants. | 19-cv-11368 (ER)<br><br>**FIRST AMENDED COMPLAINT & JURY DEMAND** |

Plaintiffs Jessie Fields, Lookman Sulaimon, Patricia Johnson, Felicia Noel, Francisco Nieves, Lakysha Allen, Yolanda Thomas, Yvonne Lane, Cheri Roach, David Bell, Rose Middleton, and Thania Acosta (collectively, "Plaintiffs"), for their Complaint against Defendants Greg Russ and the New York City Housing Authority (collectively, "Defendants" or "NYCHA"), allege as follows:

### PRELIMINARY STATEMENT

1.      As the country wrestles with economic devastation and record unemployment rates due to a global pandemic, it has never been more crucial to ensure that public housing tenants are not charged more than 30% of their income as rent, as required by the Brooke Amendment to the Housing Act of 1937. In this action, Plaintiffs, public housing tenants from all New York City boroughs, challenge Defendants' systematic failure to timely reduce their monthly rent to account

for a reduction in their household income. Plaintiffs further challenge Defendants' persistent practice of overestimating their monthly rent within the context of interim and annual income recertifications.

2.    Defendants' persistent violations of the Brooke Amendment mean that Plaintiffs, as well as scores of public housing families throughout the City, are put in the position of having to pay unlawful rents each month. And when, unsurprisingly, Plaintiffs cannot keep up with the rent that Defendants have overestimated or failed to lower, Defendants inflict further harm by suing them in housing court and placing them at risk of eviction. It is by no means just the Plaintiffs herein—Defendants sued over 34,000 families for alleged non-payment of rent in 2018 alone,[1] all the while running a rent readjustment system plagued by delays, mistakes, and ultimately, system-wide rent overcharges.[2]

3.    In fact, per Defendants' own "Housing Court Proceedings Manual for Management," local offices across all 300+ housing projects in the City are directed to initiate lawsuits against tenants upon the second month of alleged rent arrears, this without first examining whether the arrears are accurate or not—i.e., whether they may be due to Defendants' own miscalculations of the tenants' share of the rent.[3] This is a surefire way to systematically sue

---

[1] Rent Guidelines Board, *2019 Income and Affordability Study*, April 4, 2019, *available at* https://www1.nyc.gov/assets/rentguidelinesboard/pdf/ia19.pdf.

[2] Harry DiPrinzio, *Rent Calculation Problems Dog Many NYCHA Tenants*, City Limits, September 30, 2019, *available at* https://citylimits.org/2019/09/30/rent-calculation-problems-dog-many-nycha-tenants/. Defendants' operational disarray is not singular to income recertifications. In a recently entered agreement with HUD concerning mold remediation, Defendants admitted to have made "untrue statements to HUD regarding the conditions of NYCHA properties." *See Agreement*, section I(5), *available at* https://nychamonitor.com/wp-content/uploads/2019/03/Final-Executed-NYCHA-Agreement.pdf. And on his first quarterly report, the federally appointed monitor cautioned that it is "imperative that NYCHA establish comprehensive and reliable metrics so that its performance can be accurately measured and verified. We have found that NYCHA's data is often incomplete, imprecise, and/or inaccessible, creating an inaccurate perception of NYCHA's performance." *See* Bart M. Schwartz, *Monitor's First Quarterly Report*, April-June 2019, *available at* https://nychamonitor.com/wp-content/uploads/2019/07/NYCHA-First-Report-7.22.19.pdf.

[3] NYCHA, "Housing Court Proceedings Manual for Management," October 2019, p. 2.

tenants in housing court who may actually not owe any rent at all.

4.      Pursuant to the Brooke Amendment to the United States Housing Act of 1937, public housing tenants, like Plaintiffs, must be charged in rent no more than 30% of the household's monthly income. The rent share, set annually, is based upon an examination of the composition, income, and deductions applicable to the household. At any point outside of the yearly examination, however, a family experiencing a reduction in income may request an interim examination and a corresponding reduction in the rent share. Under federal law and agency rules, such an examination must be conducted within a reasonable time after the request.

5.      Defendants have systematically failed to process income recertifications within a reasonable amount of time. In fact, Defendants' own staff estimate an extensive backlog in processing times, with 50% of all recertifications processed late.[4]

6.      Furthermore, in response to the global pandemic, Defendants changed their interim examination policy to allow tenants to self-certify income loss. The usual two-month waiting period was also suspended.  Despite these advertised policy changes, many tenants have reported that Defendants' staff continue to enforce the two-month waiting period as well as demand rigorous documentation to prove income loss. Furthermore, more than two months into the advertised changes, Defendants have only processed little over half of the total 14,000 new applications received.[5]

7.      Well intended as Defendants' recent policy changes may be, they unearth their ongoing maladroitness as to the timely and accurate processing of income recertifications and rent

---

[4] NYCHA Federal Monitor, Current State Observations and Maturity Assessment Report, December 2019, *available at* https://nychamonitor.com/wp-content/uploads/2019/12/NYCHA-Current-State-Observations-and-Maturity-Assessment-Report.pdf, page 171.

setting. These execution failures severely burden public housing tenants now more than ever—at a time of national crisis.

8.      Overall, Defendants violate federal law by its pattern and practice of:

a)      egregious delays in processing interim and annual recertification requests;

b)      inaccurate rent calculations leading to rent amounts higher than 30% of the household's monthly income;

c)      improper setting of the effective date for the readjusted rent, often leaving families permanently liable for the overcharged rent share that accrued during the recalculation period;

d)      lack of notice regarding the rent share adjustment and calculation methods;

e)      closing or abandoning a pending interim recertification request upon a subsequent annual review without issuing a proper retroactive rent credit; and

f)      failure to advise tenants of their right to a hearing to contest Defendants' determination.

9.      Defendants' policies and practices violate the Brooke Amendment and its implementing regulations, the Due Process clause of the U.S. Constitution, and Defendants' own written policies.

10.      Therefore, Plaintiffs seek declaratory, injunctive and damages relief in order to force Defendants to fix their rent recertification system and not put Plaintiffs, as well as public housing tenants at large, unlawfully at risk of eviction and homelessness.

**JURISDICTION AND VENUE**

11.      This court has subject matter jurisdiction over the federal claims pursuant to 28

---

[5] Greg B. Smith, *NYCHA Tenants Struggle to obtain Offered Rent Reductions After Job Losses*, May 29, 2020,

U.S.C. §§ 1331, 1343(a)(3), and 1337. A cause of action for the federal claims is created by 42 U.S.C. § 1983.

12.     This court has supplemental jurisdiction over state claims pursuant to 28 U.S.C. §1367.

13.     Declaratory and injunctive relief are authorized by 28 U.S.C. § 2201(a) and Rules 57 and 65 of the Federal Rules of Civil Procedure.

14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b).

## PARTIES

*Plaintiffs*

15.     Jessie Fields is a public housing tenant living at 74 Roxbury Street, Apartment 1A, in Staten Island. Her tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

16.     Lookman Sulaimon is a public housing tenant living at 1307 Loring Avenue, Apartment 7C, in Brooklyn. His tenant share was improperly set at an amount which is above the statutory limit for mixed citizenship households.

17.     Patricia Johnson is a public housing tenant living at 2680 8th Avenue, Apartment 4A, in Manhattan. Her tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

18.     Felicia Noel is a public housing tenant living at 176 Schmidts Lane, Apartment 1C, in Staten Island. Her tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

---

*available at* https://www.thecity.nyc/2020/5/29/21274503/nycha-tenants-rent-reductions-after-job-loss-struggle.

19.    Francisco Nieves is a public housing tenant living at 80 Roxbury Street, Apartment 3C, in Staten Island. His tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

20.    Lakysha Allen is a public housing tenant living at 778 Henderson Avenue, Apartment 2C, in Staten Island. Her tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

21.    Yolanda Thomas is a public housing tenant living at 415 Lafayette Avenue, Apartment 5B, in Brooklyn. Her tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

22.    Yvonne Lane is a public housing tenant at 865 Gates Avenue, Apartment 2A, in Brooklyn. Her tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

23.    Cheri Roach is a public housing tenant living at 1350 5th Avenue, Apartment 3A, in Manhattan. Her tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

24.    David Bell is a public housing tenant at 2175 Lacombe Avenue, Apt 1E, in the Bronx. His tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

25.    Rose Middleton is a public housing tenant at 105 Astoria Blvd., Apt. 1D, in Queens. Her tenant share was improperly set at an amount which is above 30% of the household's adjusted income.

26.    Thania Acosta is a public housing tenant living at 154 Avenue D, Apt. 4C, in Manhattan. Her tenant share was improperly set at an amount which is above 30% of the

household's adjusted income.

***Defendants***

27.     Defendant New York City Housing Authority is a body corporate and politic established by the New York State Legislature, as set forth in § 401 of the N.Y. Public Housing Law. NYCHA has entered into an Annual Contributions Contract with the Secretary of Housing and Urban Development to administer a public housing program in New York City. NYCHA maintains its principal place of business at 250 Broadway in New York County.

28.     Defendant Gregory Russ is the Chair and Chief Executive Officer of NYCHA and is responsible for its operations.

## STATUTORY AND REGULATORY SCHEME

***The Due Process Clause of the Fourteenth Amendment***

29.     The Fourteenth Amendment to the United States Constitution guarantees that all persons shall be provided due process of law under the laws of the States. U.S. Const., Amend. XIV, Sec. 1. The Due Process Clause prohibits state action that deprives a person of their liberty or property without due process of law.

30.     Public benefits have long been afforded constitutional protection as a type of property protected by the Due Process Clause of the U.S. Constitution. In this context, due process requires, at a minimum, adequate notice and an opportunity to be heard. Due process is necessary to ensure that the public benefits to which one is entitled are accurately and fairly administered in a timely fashion, and to protect beneficiaries from erroneous deprivation.

***Public Housing Under the U.S. Housing Act and Amendments***

31.     With the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*, Congress established a federally funded public housing program with the goal of providing decent homes

and suitable living environments for families that lack the financial means to afford a home on their own. The central goal of the Act is "to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families." 42 U.S.C. § 1437(a)(1)(A).

32.    Public housing agencies ("PHAs") own and manage conventional public housing under the Act. 42 U.S.C. § 1437(a)(1)(C). By issuing regulations and policy guidance, the Department of Housing and Urban Development (HUD) is responsible for ensuring that local PHAs properly operate the public housing program as a whole.[6]

***Income Examinations and Rent Determinations***

33.    Families are eligible for public housing only if their income is below a certain threshold at the time of initial occupancy. 42 U.S.C. § 1437a(b)(2). Families must be either "low-income families" or "very low-income families." A "low-income" family has income at or below 80 percent of the median income for the area as determined by HUD, whereas a "very low-income family" has income at or below 50 percent of the median area income. *Id.*

34.    In 1969, Congress amended the Act to set maximum rents a PHA can charge as a percentage of household income. 42 U.S.C. § 1437a(a)(2)(A)(i); 24 C.F.R. § 960.253(a)(1).[7] Under the amended formula, public housing tenants can choose to pay the flat rent or rent based on income, which is generally capped at 30% of the household's adjusted income, with allowances for certain deductions. 42 U.S.C. § 1437a(a)(2)(A)(i); 24 C.F.R. § 960.253(a)(1).

35.    For families who pay an income-based rent, HUD requires the PHA to reexamine the household rent "at least annually" plus on an interim basis as necessary. 24 C.F.R. §

---

[6] The regulations are at 24 C.F.R. §§ 5.601 *et seq.* and 960.101 *et seq.* The policy guidance most relevant here is the HUD Public Housing Occupancy Guidebook § 13.0 *et seq.* (2003) (hereinafter "HUD Guidebook"), *available at* https://www.hud.gov/sites/documents/DOC_10760.PDF (last visited October 2019).

[7] The original "Brooke Amendment" of 1969 was later revised by the Housing and Community Development Act of 1974, which resulted in the codification at 42 U.S.C. § 1437a.

960.257(a) and (b). In order to determine eligibility and adjust rents, families are required to provide information related to income, household composition, and immigration status to the PHA. 24 C.F.R. § 960.259(a).

36.     Then, the PHA "must make appropriate adjustments in the rent after consultation with the family and upon verification of the information." 24 C.F.R. § 960.257(a)(1). Plus, PHAs must notify tenants of the rent readjustment in writing, as well as inform them of their right to challenge the determination pursuant to the PHAs grievance procedures. 24 C.F.R. § 966.4(c)(4).

37.     Federal statutes and regulations provide detailed rules concerning the calculation of the family's annual income and the adjusted income. Suffice it to state here that, in order to arrive at the income amount that will be the basis of the monthly rent, the PHA must: (a) calculate the family's annual income from all applicable sources; (b) subtract from all applicable deductions; and (c) arrive at the adjusted annual income. *See generally* 42 U.S.C. § 1437a and 24 C.F.R. §§ 5.609-5.611.

38.     Once the adjusted income has been determined, the PHA sets the total tenant payment (TTP) as the highest of the following amounts, rounded to the nearest dollar:

   a)      30 percent of the family's monthly adjusted income;
   b)      10 percent of the family's monthly income;
   c)      If the family is receiving payments for welfare assistance from a public agency and a part of those payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of those payments which is so designated; or
   d)      The minimum rent, as determined in accordance with § 5.630.

24 C.F.R. § 5.628(a). *See also* 42 U.S.C. § 1437a(1).[8]

---

[8] Congress has made some noncitizens ineligible for federal housing assistance, which results in a more complex formula for calculating rent. 42 U.S.C. § 1436a(a). If a household includes someone who is not eligible, the PHA must calculate rent on a prorated basis. 24 C.F.R. § 5.520(d). First, the PHA calculates the TTP, including all income in the household under 24 C.F.R. § 5.628. Second, the PHA identifies the maximum rent, which is the flat rent set by the PHA according to the size of the apartment, based on "rental value." *See* 42 U.S.C. § 1437a(a)(2)(A) & (B). Third, the PHA divides the maximum subsidy by the number of people in the household to determine the maximum subsidy per eligible household member. Fourth, the PHA multiplies the maximum subsidy by the number of eligible family members, which

39.    With the exception of Lookman Sulaimon, Plaintiffs herein, as well as the majority of public housing tenants in New York City, are governed by 42 U.S.C. § 1437a(1)(A)—that is, their rent must be no higher than 30% of their adjusted monthly income. Mr. Sulaimon resides in a "mixed citizenship" household, so his rent is calculated on the prorated basis under 42 U.S.C. § 1436a(a) and 24 C.F.R. § 5.520(d).

**HUD Requirements for Interim Rent Changes**

40.    Household changes do not occur on an annual cycle. Births and deaths, marriages and divorces, household departures, changes in income, medical or family emergencies—these and other fundamental aspects of ordinary life affect household composition and income and must be taken into account.

41.    To insure that public housing tenants pay no more than 30 percent of their actual, current income, HUD provides that a public housing family has the right to request an interim reexamination of the family income or composition "because of any changes since the last determination." 24 C.F.R. § 960.257(b).

42.    PHAs must process a request for an interim reexamination if a tenant reports an income reduction due to employment layoffs, cutback in hours, a change in family composition, increases in child care costs, increases in unreimbursed medical costs, and other circumstances that decrease the household's income or increase eligible deductions. HUD Guidebook § 13.1.

43.    Federal regulations require PHAs to promptly process interim reexaminations. The PHA "must make the interim reexamination within a reasonable time after the family request." 24 C.F.R. § 960.257(b).

---

results in the total subsidy payment to the household. The household rent is the flat rent minus the total subsidy payment. 24 C.F.R. § 5.520(d).

44.     PHAs must give tenants written notification of the adjustment in rent as well as the effective date. 24 C.F.R. § 966.4(b)(1)(ii). In the case of a rent reduction following an interim reexamination, the effective date is the first of the month following the reported change (not the date the PHA concluded the reexamination). HUD Guidebook § 13.1 and 13.3.

45.     Under HUD guidelines, PHAs must reduce a tenant's rent in response to an income drop, except for: (a) a reduction in welfare payments due to welfare fraud; or (b) a failure to comply with economic self-sufficiency requirements. HUD Guidebook § 13.1 and 13.5.

**_NYCHA Policies on Interim Rent Changes and Housing Court Proceedings_**

46.     Under HUD guidelines, PHAs establish their own written policy on when and under what conditions the family must report a change in family income or composition. 24 C.F.R. § 960.257(b), (c), & (d). NYCHA policy distinguishes between interim recertifications resulting in rent reductions and those resulting in rent increases. NYCHA Management Manual, Ch. III § XIV (2016).

47.     For interim rent reductions, NYCHA policy provides that the effective date of the change is the first of the month following the date on which the decrease occurred if the tenant provides notice to management within thirty days. _Id._ at Ch. III § XIV(A). If the tenant provides notice more than thirty days after the change, the effective date is the first of the month following the date of notification of the change, "unless the tenant satisfactorily demonstrates that the failure to report the change was beyond his/her control." _Id._ at Ch. III § XIV(A).

48.     The policy also states that "some situations may require a two (2) month waiting period before changing the rent with a retroactive credit for the waiting period," while other situations will have no waiting period. _Id._ at Ch. III § XIV(A)(1)–(5).[9] A family may also qualify

---

[9] With respect to a two-month waiting period, and separate from Defendants' recent pandemic-related changes, the only

for an interim change based on rent hardship if the family experiences a five percent reduction in gross income, the current rent is more than 30% of the net income, and the reduction in income has lasted at least two months. *Id.* at Ch. III § XIV(A)(5).

49.     NYCHA policy also addresses interim rent increases in specific situations. *Id.* at Ch. III § XIV(B)(1). These include where a new person is added as a permanent member of the household, the tenant filed a late affidavit of income, or when household income recovers after a prior rent reduction.

50.     In addition, per NYCHA's "Housing Court Proceedings Manual for Management," local management offices are called to initiate nonpayment lawsuits against tenants who fall two months in alleged arrears. NYCHA, "Housing Court Proceedings Manual for Management," October 2019, p. 2. The only two exceptions to this automatic-lawsuit rule is if (i) there is a pending housing court case, or (ii) there is a pending bankruptcy proceeding. *Id.* Notably, the rule does not require that management offices at the local level examine, prior to initiating suit, whether the alleged arrears may be due to a miscalculation of the tenant's rent share.

## STATEMENT OF FACTS

51.     Due to Defendants' failure to timely reduce Plaintiffs' rent share in response to an income drop, as well as their persistent pattern of overestimating Plaintiffs' rent in the context of both interim and annual reviews, Plaintiffs currently pay or remain liable for an amount higher than 30% of the household's monthly adjusted income.

---

such situation the policy specifies is when a household member who is employed fulltime becomes unemployed for at least two months as a result of a strike, layoff or work-related injury or illness. In that case, the rent reduction is effective the first of the month after notice or after a two-month waiting period, whichever is later, with a retroactive credit for any waiting period. In cases involving the permanent loss of a family member with income or enlistment in the U.S. Armed Services, there is no waiting period.

52.     As a matter of pattern and practice, Defendants egregiously violate the federal mandate that interim rent adjustments be processed within a reasonable time and thus compels Plaintiffs to pay rent in excess of federal limitations. Plaintiffs have waited many months, in some cases for over a year, to have their family shares reduced to an affordable amount as required by federal law.

53.     In other cases, after a request for an interim examination and submission of required documentation, Defendants have taken no action whatsoever or have abandoned a pending request in favor of resolving a subsequent annual review, without issuing a proper retroactive rent credit.

54.     Even where Defendants have completed interim reexaminations, tenant rent shares have been improperly set without regard to the family's income. Defendants routinely mishandle both interim and annual recertifications by including income that stopped prior to the examination date or that the family never had.

55.     Defendants have not given Plaintiffs proper notice of the agency determinations, including the basis underlying the share adjustment calculations, or of the family's right to a hearing to contest the determination.

56.     Defendants have failed to properly set the effective date and adjust the tenant share to the proper retroactive date after an interim or an annual rent readjustment determination. Instead, Defendants often unlawfully apply the rent change prospectively, leaving the family permanently liable for the unaffordable share that accrued during the recalculation period. Even when public housing tenants are able to obtain public assistance grants to pay the otherwise unaffordable rent arrears, they are then left with debts to the City that must be repaid, impairing their ability to meet future household expenses, including rent.

57.     Defendants have failed to institute and promulgate effective procedures or train and supervise its staff, and have not instituted an adequate system for tracking the submission of documents and correspondence or otherwise tracking their performance as it relates to the timely and accurate processing of interim and annual rent examinations.

58.     Lastly, Defendants initiate administrative tenancy termination proceedings and/or judicial eviction proceedings based in whole or in part on alleged rent arrears tainted by illegal rent overcharges. In the case of eviction proceedings, following their own internal rules, Defendants file suit automatically upon the second month of alleged arrears, this without conducting a pre-suit examination as to whether the rent charged to the tenant is even correct and lawful. An examination of the correctness of the rent then becomes a part of the lawsuit itself, if at all. This is a "file suit first, figure out whether the rent is correct later" way of doing business. Needless to say, an examination of the correctness of the tenant's rent share prior to initiating suit could avoid the filing of numerous improper eviction proceedings.

59.     Defendants' policies and practices violate the Brooke Amendment and its implementing regulations, the Due Process clause of the U.S. Constitution and NYCHA's own written policies.

*Individual Plaintiffs*

60.     Due to the pervasiveness and widespread effects of NYCHA's illegal policies and practices, plaintiffs reside throughout all New York City boroughs.

*Jessie Fields*

61.     Jessie Fields is the tenant at 74 Roxbury Street, Apartment 1A, in Staten Island. She resides in public housing administered by the New York City Housing Authority, which determines her rent based on her income.

14

62.     Ms. Fields is 83 years-old and has lived in this apartment for 50 years. She lives with her two granddaughters and her two great-grandchildren.

63.     At all times relevant to the allegations herein, the household's sole income was from SSI totaling $1,609.00 per month.

64.     One of Ms. Field's granddaughters was employed part time for under two months starting in April 2018. During Ms. Fields' annual recertification in August 2018, Ms. Fields' rent jumped from $457.00 to $868.00 as of September 1, because NYCHA included her granddaughter's employment income despite the fact she was no longer working. Based on the household's income at the time, Ms. Fields' share should have been approximately $482.00 per month.

65.     As Ms. Fields was not able to fully pay her overestimated share of the rent, NYCHA commenced a non-payment proceeding against her in Staten Island Housing Court, under Index Number L&T 011243-18.

66.     Starting in November 2018, Ms. Fields' granddaughter attempted to supply NYCHA with documentation of her unemployment benefits denial so that their rent could be adjusted. She brought the relevant documents to her housing assistant four times, but the paperwork was never processed. When NYCHA finally accepted the documents in January 2019, they misread the paperwork and believed Ms. Fields' granddaughter was receiving unemployment benefits, further prolonging the recertification process. They misread it again in February 2019, prolonging the process yet again and improperly setting the family rent at $697.

67.     In March 2019, NYCHA correctly recertified Ms. Fields' rent at $466 per month, but only gave her retroactive credit back to November rather than September 2018. She received a grant from the City Human Resources Administration ("HRA") to pay her remaining arrears

totaling $3,063.60 (typically known as a "one shot deal"). These arrears include the improper rent

claims for September and October that NYCHA had never corrected. The one shot deal was non-

recoupable as Ms. Fields' Social Security is the sole household income. There was no judgment

granted.

68.     As a result of NYCHA's conduct, Ms. Fields was liable for a rent in excess of the

amount allowed under federal law for a period of 8 months. Ms. Fields was at risk of eviction

because of NYCHA's conduct.

69.     Ms. Fields suffered damages from the rent overcharge and emotional distress in an

amount to be determined at trial.

***Lookman Sulaimon***

70.     Lookman Sulaimon is a public housing tenant living at 1307 Loring Avenue,

Apartment 7C, in Brooklyn. He resides in public housing administered by the New York City

Housing Authority, which determines his rent based on her income.

71.     Mr. Sulaimon is a retiree who has lived in NYCHA's Pink Houses development in

the East New York neighborhood of Brooklyn for over 20 years.

72.     He lives with his wife and his 93-year-old mother.

73.     Until recently, Mr. Sulaimon worked as a self-employed graphic artist.

74.     As of January 2018, Mr. Sulaimon was charged a monthly rent of $1,065.00. In

April 2018, Mr. Sulaimon experienced a precipitous decline in his health, and was hospitalized for

over three weeks in the intensive-care unit. He was no longer able to work and has since been

forced to retire.

75.     Upon his release, he went to the management office and informed them that he was

unable to work, provided a doctor's letter, and requested that his rent be adjusted accordingly.

16

Mr. Sulaimon's income had dropped to zero, and the only income in the household was from his wife, who made $18,173.79 in 2018 working at a fast-food restaurant. The family's rent should therefore have been reduced to approximately $952 per month.

76.     Instead of responding to Mr. Sulaimon's rent grievance or his request for an interim rent adjustment in light of his medical inability to work, NYCHA filed a nonpayment eviction case against him in June 2018.

77.     In July, Mr. Sulaimon again went to the management office to plead his case against the rent increase, and for a rent adjustment based on the decline in household income. Again, NYCHA refused to respond.

78.     Fearing eviction, Mr. Sulaimon applied to HRA for a one shot deal to pay all the rent claimed—even though it was based on a rent amount he had challenged, and even though NYCHA never responded to his grievance. Mr. Sulaimon was approved for a recoupable (i.e., loan) one shot deal in the amount of $6,788.81, which was paid directly to NYCHA in October 2018.

79.     For a moment, it seemed like Mr. Sulaimon's rent problems were over. NYCHA reduced the rent to $569.60 for October and November 2018—which likely helped with the approval of Mr. Sulaimon's application for assistance, approval of which is predicated on future ability to pay rent—and discontinued the nonpayment case against him.

80.     However, NYCHA immediately hiked up the rent even further just two months later, starting in December 2018—to $1,493.60, although the family's income had not changed.

81.     Several months later, NYCHA brought another nonpayment eviction case against Mr. Sulaimon, which remains pending, based on the new rent of $1,493.60. Mr. Sulaimon filed a rent grievance to contest the $1,493 rent figure, which has not been resolved.

82.     Mr. Sulaimon still owes the $6,788.81 he borrowed from the City to pay the back rent through October 2018, and remains subject to eviction based on NYCHA's unlawful claims for rent for the most recent year.

83.     Mr. Sulaimon suffered damages from the rent overcharge and emotional distress in an amount to be determined at trial.

*Patricia Johnson*

84.     Patricia Johnson is the tenant of record at 2680 8th Avenue, Apartment 4A, New York, NY 10030. She resides in public housing administered by the New York City Housing Authority, which determines her rent based on her income.

85.     Ms. Johnson lives in the NYCHA development known as Drew Hamilton Houses.

86.     Ms. Johnson has lived in this apartment for 30 years. She resides in the apartment with her brother and three sisters.

87.     Ms. Johnson completed her annual certification in August 2018. Her rent increased from $841.66 to $1,955.75 as of September 2018. The large increase occurred because NYCHA mistakenly imputed $62,855 in unemployment income to Ms. Johnson's sister for that year, when she actually only received $1,208.75.

88.     Contrary to NYCHA's erroneous calculations, the total adjusted income subject to Ms. Johnson's income recertification was $42,015.10. Therefore, the total rent should have been $1,050.38, not $1,955.75.

89.     Ms. Johnson immediately reported the issue to the local management office in her development. She was told that the issue would be fixed and, in the meanwhile, she should continue to pay her prior rent of $841.66. Based on this instruction, Ms. Johnson continued to pay $841.66 in rent.

18

90.     Despite following the instructions of her local management office, NYCHA continued to charge Ms. Johnson the incorrect $1,955.75 amount and subsequently sued her in housing court under L&T Index No.12997/2019 for arrears she did not owe.

91.     Subsequent to initiating a suit against Ms. Johnson, NYCHA attempted to fix the miscalculation by reducing the rent retroactively to $1,387.60 for the months September 2018-June 2019, giving her a total credit of $5,682.00. However, even this amount is wrong because she was supposed to only be charged $1,050.00.

92.     Upon information and belief, Ms. Johnson is entitled to an additional credit of $2,090 for the time period of September 2018 through June 2019, which is the time period NYCHA overcharged her for.

93.     To date, Ms. Johnson is still working with her housing attorney and local management office to resolve any remaining discrepancy before finally resolving the housing court case.

94.     Even if eventually settled, however, this case has been an undue hardship to Ms. Johnson as she has never been sued in housing court before and has always complied with the income recertification process and rules. She was dragged to court and put at risk of eviction and homelessness, and this all was the result of NYCHA's own mistakes and conflicting information delivered to Ms. Johnson.

95.     Ms. Johnson suffered damages from the rent overcharge and emotional distress in an amount to be determined at trial.

**_Felicia Noel_**

96.     Felicia Noel is the tenant at 176 Schmidts Lane, Apartment 1C, in Staten Island. She resides in public housing administered by the New York City Housing Authority,

which determines her rent based on her income.

97.     Ms. Noel has lived in this apartment for 5 years. She lives with her minor son.

98.     Ms. Noel was employed for the majority of 2018 and her rent was set at $823.00, based upon her employment income and child's SSI income.

99.     In November 2018, Ms. Noel was injured and went on medical leave from November 2018 until May 2019.

100.    Ms. Noel applied for public assistance and also requested an interim recertification in January 2019. NYCHA used her previous employment income to set the rent at $894.00, when it should have set her rent share at the amount of the public assistance shelter allowance.

101.    Ms. Noel received rental arrears assistance from HRA in February 2019, which upon information and belief covered all arrears through February at the rate of $894 per month. Upon information and belief, HRA contacted NYCHA during the rental arrears application to verify her income and HRA subsequently requested that NYCHA readjust her rent. However, NYCHA continued to charge her $894.00 per month.

102.    Ms. Noel was able to go back to work part-time in May 2019. Ms. Noel explained that she brought employment letters to NYCHA during this period but that management did not accept them. Throughout this process, Ms. Noel's management office would not give her receipts to confirm her attempts.

103.    As Ms. Noel was not able to pay her overestimated share of the rent, NYCHA commenced a non-payment proceeding against her in Staten Island Housing Court, under Index Number L&T 010608-19.

104.    In a stipulation signed in court on August 6, 2019, Ms. Noel was scheduled for an interim recertification. Ms. Noel states she brought all the documents to the management office in

August 2019 but NYCHA states that she did not bring all documents until September 2019. NYCHA is now recertifying Ms. Noel effective November 1, 2019 to the accurate rent of $596.00.

105.    As a result of NYCHA's conduct, Ms. Noel is liable for a rent in excess of the amount allowed under federal law for a period of 10 months, January through October 2019.

106.    Ms. Noel suffered damages from the rent overcharge and emotional distress in an amount to be determined at trial.

*Francisco Nieves*

107.    Francisco Nieves is the tenant at 80 Roxbury Street, Apartment 3C, in Staten Island. He resides in public housing administered by the New York City Housing Authority, which determines his rent based on his income.

108.    Mr. Nieves has lived in this apartment for 23 years. He lives with his partner and his adult son. Approximately from fall 2018 through spring 2019, the sole income for their entire household was $760.00 per month from SSI.

109.    Mr. Nieves' partner has a seasonal job and works fulltime over the summer. They have frequent issues with interim recertification regarding her seasonal employment. After his annual recertification in October 2018, Mr. Nieves' family share of the rent jumped from $221.00 to $731.00 per month despite the fact that his partner was no longer working.

110.    In January 2019, Mr. Nieves had an interim recertification because his rent was extremely high, however, the rent was inexplicably raised again to $1,356.00. Mr. Nieves then requested yet another interim recertification and the rent was lowered to $841.60 in February. But based on the family income, their share should only have been approximately $228.00 per month.

21

111.     As Mr. Nieves was unable to fully pay his overestimated share of the rent,

NYCHA commenced a non-payment proceeding against him in Staten Island Housing Court,

under Index No. L&T 010250-19.

112.     Mr. Nieves' rent was accurately recertified through an interim recertification in

May 2019 and he was retroactively credited for his overcharges. He received a one shot deal from

HRA totaling $630.20 for his remaining arrears and the case was discontinued. Upon information

and belief, this amount represents a remaining overcharge based on non-existent work income.

113.     As a result of NYCHA's conduct, Mr. Nieves was liable for a rent in excess of the

amount allowed under federal law for a period of 7 months.

114.     Mr. Nieves suffered damages from the rent overcharge and emotional distress in an

amount to be determined at trial.

*Lakysha Allen*

115.     Lakysha Allen is the tenant at 778 Henderson Avenue, Apartment 2C, in Staten

Island. She resides in public housing administered by the New York City Housing Authority,

which determines her rent based on her income.

116.     Ms. Allen has lived in this apartment for 20 years. She lives with her minor

daughter.

117.     Ms. Allen occasionally works at a temp agency in addition to her primary

employment. In June 2018, Ms. Allen stopped frequently working at the temp agency and turned

to working occasional shifts to supplement her income. However, she claims that NYCHA

calculated her income as if she were working at the temp agency full-time in addition to her

primary job. She alerted NYCHA of this discrepancy and was told she had to wait until her 2019

annual recertification for her rent to be adjusted.

118.    Before her annual certification, Ms. Allen's family share of the rent was set at $1,779.00 per month. In June 2019, a year after her hours at the temp agency changed, she recertified and her rent erroneously rose to $1,874.00 per month, placing the rent above the ceiling of $1,787.00 for her three bedroom unit.

119.    As Ms. Allen was unable to fully pay her overestimated share of the rent, NYCHA has commenced a non-payment proceeding against her in Staten Island Housing Court, under Index Number L&T 010383-19.

120.    When Ms. Allen retained Staten Island Legal Services as counsel in her nonpayment proceeding her attorney alerted her that she was entitled to an interim recertification. In July 2019, Ms. Allen submitted all the documentation to recertify, but was told that no recertifications are being processed at West Brighton because the office manager is on vacation.

121.    Ms. Allen wanted her grandchild to be added to the lease and NYCHA told her that unless her case was discontinued he would not be added. Ms. Allen then withdrew $4,000.00 from her retirement account to pay the arrears through August and the eviction case was discontinued. However, her office manager was still out of office in August 2019 and NYCHA told her that her grandchild could not be added to the lease. In October 2019 NYCHA lowered the rent to $1,859.00 and still would not add Ms. Allen's grandchild to the lease.

122.    As a result of NYCHA's conduct, Ms. Allen has been liable for a rent in excess of the amount allowed under federal law for a period of 18 months and was forced to withdraw funds from her retirement savings.

123.    Ms. Allen suffered damages from the rent overcharge and emotional distress in an amount to be determined at trial.

***Yolanda Thomas***

124.    Yolanda Thomas is the tenant at 415 Lafayette Avenue, Apartment 5B, in Brooklyn. She resides in public housing administered by the New York City Housing Authority, which determines her rent based on her income.

125.    Ms. Thomas' apartment is part of a NYCHA development known as Lafayette Gardens Houses.

126.    Ms. Thomas lives with her 18-year-old son and her 14-year-old daughter.

127.    In December 2018, NYCHA commenced a nonpayment proceeding against her under L&T Index No. 18505/2018.

128.    Ms. Thomas received a one shot deal loan from HRA in January 2019 for $5,125.93 covering July 2018 to December 2018, which resolved her nonpayment proceeding.

129.    However, on January 14, 2019, Ms. Thomas was given notice that an administrative tenancy termination proceeding based on chronic rent delinquency ("CRD"), 907028-CR-19, was being started against her.

130.    In March 2019, Ms. Thomas got reduced from full-time to part-time employment. With a net monthly income of $2,729.65, Ms. Thomas was unable to afford her rent of $1,043. Her rent should have fallen to $806.90, but instead in April 2019, it rose to $1,055.

131.    She went into the Management Office with her paystubs on 4-5 occasions in an attempt to adjust her rent. She was turned away by the NYCHA employees and told that the NYCHA mobile unit does the adjustments. Upon information and belief, the "mobile unit" is a trailer containing computer terminals that is supposed to visit Ms. Thomas's project bi-weekly, but only serves the first 11-12 people who need rent adjustments.

132.    Unsuccessful in adjusting her rent at the Management Office, Ms. Thomas reached out to Tyree Stanback, President of the Residents Association, for assistance. On May 23, 2019,

Mr. Stanback sent Ms. Thomas' paystubs to NYCHA via email requesting an interim rent adjustment.

133.    Finally, in July 2019, the Management Office correctly adjusted Ms. Thomas' rent to $699, but denied her request for a retroactive rent adjustment. NYCHA refused Ms. Thomas' request for a retroactive rent adjustment and the Housing Assistant recommended that Brooklyn Legal Services assist Ms. Thomas in a rent grievance.

134.    NYCHA still has not adjudicated Ms. Thomas's rent grievance and is still claiming over $700 in rent arrears.

135.    NYCHA adjourned the CRD termination proceeding and has not chosen a new hearing date. The termination proceeding cannot be resolved until NYCHA properly adjusts her rent.

136.    Ms. Thomas suffered damages from the rent overcharge and emotional distress in an amount to be determined at trial.

***Yvonne Lane***

137.    Yvonne Lane is the tenant at 865 Gates Avenue, Apartment 2A, in Brooklyn. She resides in public housing administered by the New York City Housing Authority, which determines her rent based on her income.

138.    Ms. Lane's apartment is part of the NYCHA development known as Stuyvesant Gardens Houses.

139.    Ms. Lane lives with her adult daughter and 10 year old granddaughter. She has been a NYCHA tenant for 46 years.

140.    Up to May 2018, Ms. Lane was earning work wages and her monthly rent was set at $1,381.

141.    Ms. Lane retired and informed NYCHA of her retirement and her prospective Social Security benefits in housing court on May 29, 2018 during an appearance for a nonpayment proceeding, L&T 13229/2018.

142.    On August 12, 2018, Ms. Lane received her first Social Security award letter, and soon thereafter submitted a copy to the management. On September 21, 2018, NYCHA issued an Interim Lease Addendum and Rent Notice, stating that Ms. Lane's new rent would be $428 and that the rent would commence October 1, 2018, and the lease would be effective August 1, 2018. NYCHA continued to bill Ms. Lane $1,431 through and including November 2018.

143.    In January 2019, another nonpayment proceeding was commenced against Ms. Lane, L&T 24532/2018. Ms. Lane requested a level one rent grievance.

144.    On March 11, 2019, Ms. Lane requested through counsel that her rent be reduced to $428 effective August 1, 2018.

145.    Following a Rent Grievance Hearing with Brooklyn Property Management, Ms. Lane's grievance was denied on May 28, 2019. Management maintained that the rent calculation was correct despite NYCHA's failure to issue Ms. Lane a credit for the month of August 2018.

146.    Ms. Lane has done four rent grievances and NYCHA is still suing her for this money in the nonpayment proceeding L&T 24532/2018, wherein NYCHA alleges Mr. Lane owes $3,865 in rental arrears.

147.    Ms. Lane suffered damages from the rent overcharge and emotional distress in an amount to be determined at trial.

***Cheri Roach***

148.     Cheri Roach is the tenant of record at 1350 5th Avenue, Apartment 3A, New York, NY 10026, in the NYCHA development known as King Towers. She resides in the apartment with her adult brother and aunt, both whom have disabilities.

149.     Ms. Roach completed an annual certification in July or August 2015. At that time, her rent was properly calculated as $936 based on a total household income of $37,900.

150.     Later in 2015, Ms. Roach's brother stopped working due to illness.  Ms. Roach went to the management office to report the drop in household income, but NYCHA failed to adjust her rent.

151.     In 2016, Ms. Roach completed another annual recertification, but NYCHA still failed to reduce the rent despite the loss of her brother's income since the prior recertification.

152.     In February 2017, Ms. Roach lost her business operating a daycare center. The only income in the household was the SSI disability benefits that her aunt was receiving.

153.     Ms. Roach immediately took steps to notify NYCHA, but to no avail, and her rent continued to accumulate at $936.00 monthly.

154.     NYCHA commenced a nonpayment case against Ms. Roach in June 2017.

155.     In one of the court dates, Ms. Roach was instructed to visit her management office on August 9, 2017 to meet with NYCHA staff to provide proof of her reduced income in order to have her rent reduced. Ms. Roach attended this meeting and provided the required proof, but NYCHA did not fulfill its obligation to reduce Ms. Roach's rent accordingly.

156.     On September 1, 2017, Ms. Roach, appearing in court without the assistance of counsel, agreed to a judgment for $10,294.94, to be paid by September 30, 2017. The judgment stipulation acknowledged that Ms. Roach should seek a rent grievance.

157.    Ms. Roach attempted to file a grievance but could not induce NYCHA to reduce her rent.

158.    NYCHA continued to charge Ms. Roach $936 per month, and the Human Resources Administration refused to pay the arrears because she had insufficient income to pay the $936 rent prospectively.

159.    Ms. Roach states that she went to the office several times in succeeding year to discuss having her rent adjusted and was either told she could not be seen or that the rent could not be adjusted because there was a judgment. She does not recall the exact dates but knows that she went several times.

160.    Ms. Roach was served with a Marshal's Notice a year after the entry of judgment. She filed an Order to Show Cause in Housing Court to stay her eviction.

161.    Once the case was restored, Ms. Roach was referred to and retained Manhattan Legal Services through the City's Universal Access to Counsel program.

162.    After several adjournments to get the rent adjusted, Counsel for Ms. Roach had to personally go to the management office on December 12, 2018 before NYCHA finally adjusted the rent downward to $425.00 per month.  This amount reflected Ms. Roach's income from a job she had started in October 2018, and her aunt's SSI income.

163.    Ms. Roach was only given a retroactive credit of $2,555. Counsel was told by the housing manager that Ms. Roach could only receive a credit dating back to August 2018 because that was when her last annual recertification was due and that the computer system would not allow her to go back any further.

164.    On December 13, 2018, the eviction case was settled for Ms. Roach to pay $21,777.82 by January 31, 2019, which was paid by a rent arrears grant from the Human

Resources Administration.

165.    Although the eviction case was discontinued, upon information and belief, Ms.

Roach is liable to repay this loan to HRA.

166.    Upon information and belief, had Ms. Roach's rent been properly adjusted, she

would have owed at least $9,000 less than the amount she borrowed from HRA.

167.    As a result of NYCHA's failure to timely adjust Ms. Roach's rent, she experienced

hardship and emotional distress, with an eviction case hanging over her head for 18 months.  If

Ms. Roach had not been lucky enough to have obtained counsel, she would have been unlikely to

even have obtained the $21,777 loan from HRA, and her family might well have been evicted.

168.    Ms. Roach suffered damages from the rent overcharge and emotional distress in an

amount to be determined at trial.

***David Bell***

169.    David Bell is the tenant at 2175 Lacombe Avenue, Apt 1E, Bronx, New York 10473.

He resides in public housing administered by the New York City Housing Authority, which

determines his rent based on his income.

170.    Mr. Bell is 64 years-old and has resided in his studio apartment alone for

approximately 6 years.

171.    In June 2017, Mr. Bell first contacted the management office at his housing complex

to report his claim that his rent was being improperly calculated as his share of rent had recently

increased from $327 per month to $749 per month. Mr. Bell received no response to his letter, which

was addressed to Mr. Parris, Borough Manager at 1932 Arthur Avenue, 5th Floor, Bronx, New York

10457, as well as to his complex's housing manager.

172.     According to Mr. Bell's 2017 W2 statement of earnings, he grossed $25,325.49 in employment income that year. At 30 percent of his income, his monthly rent share should have been no more than approximately $633 per month, rather than the $743 charged by NYCHA.

173.     In 2018, Mr. Bell's employment income, which was buoyed by overtime hours, increased to $37,250.12. NYCHA then increased his rent share from $743 to $1,087 as of February 1, 2019. This increase relied on improper income projections and, therefore, resulted in an overestimation of his tenant share.

174.     Unable to pay his rent share, Mr. Bell was sued by NYCHA in a non-payment proceeding commenced sometime on or about December 2018 in Bronx Housing Court under index number L& T 812530/18.

175.     On his initial appearance, Mr. Bell informed the court that he believed NYCHA had improperly calculated his share of the rent and was refusing to adjust it. Subsequently, the Hon. Eneida Pilar Sanchez referred his case to Bronx Legal Services for possible representation.

176.     After Bronx Legal Services was retained to assist Mr. Bell, counsel sent a rent grievance packet to Castle Hill Houses Management office on or about March 14, 2019. The rent grievance from counsel included a copy of Mr. Bell's 2017 letter as well as several current paystubs and an explanation of his income fluctuations.

177.     In housing court, representatives for NYCHA formally acknowledged receipt of Mr. Bell's rent grievance from counsel on March 21, 2019 and his housing case was adjourned until May 9, 2019 for his request to be processed and reviewed.

178.     On May 9, 2019, the housing court proceeding was once again adjourned for NYCHA to respond to counsel's March rent grievance. At that time, NYCHA requested updated documents as it alleged the ones previously sent by counsel were not clear.

179.    In order to fulfill NYCHA's request, on the subsequent court appearance on June 6, 2019, counsel for Mr. Bell offered new income documents—several current paystubs as well as his 2017 and 2018 W2s—in support of his rent grievance. Inexplicably, the housing assistant in court on that day refused to accept the documents proffered and instead scheduled a rent grievance meeting for Mr. Bell for June 21, 2019 at the housing manager's office. The housing court proceeding was adjourned to July 15, 2019 for the rent grievance meeting and for a determination to be made on Mr. Bell's request.

180.    Mr. Bell attended the June 21, 2019 meeting where the housing manager requested the same documentation that was previously refused in court. Counsel subsequently mailed copies of the documentation requested to the management office before the next court date. Despite these various efforts to submit requested documentation to NYCHA, there was no determination made on Mr. Bell's request by the July court appearance and the case was adjourned, yet again.

181.    In the interim, Mr. Bell completed his 2019 annual recertification and his rent was decreased to $862 per month effective September 1, 2019.

182.    In court in September 2019, a housing assistant informed counsel that she had been advised that Mr. Bell's rent grievance would no longer be addressed because he had completed his annual recertification. She also advised that Mr. Bell did not submit sufficient documentation but refused to specify what documents were missing that were not previously provided. Counsel requested a decision in writing on Mr. Bell's grievance so that the formal process to appeal could be followed. None was provided.

183.    At the September 2019 court appearance, the court admonished NYCHA that the proceeding would be dismissed without prejudice should NYCHA continue its failure to address Mr.

Bell's rent grievance. The proceeding was adjourned from September 12, 2019 to October 28, 2019 to provide NYCHA a final opportunity to respond to Mr. Bell's grievance.

184. October 28, 2019 came and, despite repeated adjournments and the court's admonition, there had been no movement on NYCHA's part as to Mr. Bell's rent grievance. As a consequence, the housing court dismissed the petition against Mr. Bell without prejudice.

185. Meanwhile, in September 2019, Mr. Bell lost his employment and sole source of income at the time. Between September 2019 and November 2019, Mr. Bell only received a few hundred dollars from the Human Resources Administration. Beginning in November 2019, Mr. Bell's sole income has been Social Security of $1,180 per month.

186. The same month he lost his employment, Mr. Bell went to the management office and provided a copy of his discharge paperwork. He also submitted documentation to HRA for assistance before he could receive his Social Security benefits. In the ensuing months, Mr. Bell continued to visit his management office to request a rent readjustment.

187. In spite of this documentation of Mr. Bell's September 2019 job loss and his repeated visits to the management office, NYCHA did not readjust his rent. To date, his monthly rent remains $862 per month even though, based on his sole monthly income of $1,180, it should not be any higher than approximately $350.

188. As a result of NYCHA's conduct, Mr. Bell remains liable for rent going back to at least 2017 in excess of the amount allowed under federal law. Mr. Bell was and is at risk of eviction because of NYCHA's conduct.

189. Mr. Bell suffered damages from the rent overcharge and emotional distress in an amount to be determined at trial.

*Rose Middleton*

190.    Rose Middleton is the tenant at 105 Astoria Blvd., Apartment. 1D, in Queens. She resides in public housing administered by the New York City Housing Authority, which determines her rent based on her income.

191.    Ms. Middleton has lived in Astoria Houses for over 19 years. She currently lives with her son, daughter, grandson and elderly mother.

192.    In February 2019, NYCHA sent Ms. Middleton a letter informing her that NYCHA was considering terminating her tenancy because of nonverifiable income. Ms. Middleton was confused because she had properly completed her 2018 annual review and the 2019 annual review was not yet due. As there had been no action or omission on Ms. Middleton's part to prompt the commencement of a rent-related agency termination proceeding, she contacted her development about this letter.

193.    She was then instructed to submit her current income, without any further explanation. She complied with this inexplicable directive even though the submission date for her annual review usually falls in July of each year. With her February 2019 income submission, she reported an annual income of $71,122.42.

194.    Despite NYCHA's termination-threatening letter and the February 2019 request for income documentation outside of Ms. Middleton's annual review, NYCHA did nothing for the next seven months. Finding herself in limbo, on September 11, 2019, Ms. Middleton went to the management office to follow up with the housing assistant. At that time, NYCHA gave her a new lease which increased the monthly rent from $813.00 to $1,847.00, effective October 1, 2019.

195.    On or about September 25, 2019, Ms. Middleton went to her management office and submitted a grievance letter to challenge her rent calculation as well as the effective date of

her lease. Ms. Middleton's rent should have been between $1,300.00 and $1,500.00 based on: her household income; her eligible deduction for her as well as her daughters' child care expenses; and her eligible deduction for income disallowance due to the time she was in school and collective HRA benefits. As to the lease effective date, based on her usual annual review it should have been November 1, 2019, rather than October 1, 2019.

196.    Ms. Middleton was told that the housing manager at her development would review the grievance.

197.    Having not received a response to her grievance, in early November 2019, Ms. Middleton spoke with her development's manager. She addressed the rent issue with the manager several times after that November meeting and provided the manager with additional household income documents requested from her.

198.    In November 2019, Ms. Middleton became unable to pay her overestimated rent. She worked tirelessly to resolve the issue by the end of that month to avoid being further overcharged. Ms. Middleton was eager to avoid a termination proceeding based on nonpayment of rent.

199.    On December 18, 2019, the housing manager handed Ms. Middleton a grievance summary stating that she agreed with the housing assistant's denial of the grievance, except that Ms. Middleton never received any such denial from the housing assistant. The summary advised her that, if she disagreed with the outcome, she could request in writing a review by her local NYCHA Borough Office.

200.    Ms. Middleton immediately submitted the request.

201.    On January 17, 2020, Ms. Middleton lost her job.

34

202.     On January 27, 2020, Ms. Middleton attended a meeting—in response to the rent grievance—at the NYCHA Borough Office in Queens. She informed NYCHA that she lost her job that same month as well as the reasons why the September 2019 rent calculation was incorrect. As to the rent calculation, NYCHA acknowledged that the child care calculation of Ms. Middleton was incorrect. However, NYCHA failed to retroactively apply Ms. Middleton's child care expense deduction—totaling approximately $7,800.

203.     As to her job loss, instead of lowering her monthly rent, inexplicably NYCHA informed her that they would increase it from $1,847.00 to $1,889.00. Ms. Middleton was given a new lease for this amount in February 2020, effective April 2020.

204.     In February 2020, Ms. Middleton applied for unemployment benefits. She began receiving unemployment in March 2020. Ms. Middleton informed NYCHA in March 2020 and sought an interim rent adjustment.

205.     Instead of responding to Ms. Middleton's request for an interim rent adjustment, on February 25, 2020, NYCHA served Ms. Middleton with a Chronic Rent Delinquency (CRD) notice.

206.     Fearing eviction, on February 28, 2020, Ms. Middleton applied to the Human Resources Administration (HRA) for a one-shot deal to pay all the rent NYCHA alleged she owed—even though it was based on a rent amount she had challenged in the grievance she filed in 2019. The alleged amount in rental arrears was $8,418.37.

207.     In March 2020, Ms. Middleton followed up with NYCHA and provided proof of her reduced income as a result of losing her job in January 2020. The same month, she received her unemployment approval letter, which she also immediately submitted to NYCHA.

208.     Also in March 2020, Ms. Middleton requested a hearing to challenge Borough Office's decision denying her rent grievance and increasing her rent. Ms. Middleton is waiting for a response to this day.

209.     Later that month, her daughter lost her job and applied for unemployment benefits in April 2020. Ms. Middleton immediately informed NYCHA management of this change in her household income but NYCHA failed to update her monthly rent.

210.     The one-time rental arrears grant was approved by HRA on May 1, 2020, effectively handing over to NYCHA arrears amounts tainted by illegal rent overcharges.

211.     Ms. Middleton spoke with a NYCHA housing manager again in May 2020. At that meeting, NYCHA inexplicably raised her rent to $2,008.00, effective September 2020.

212.     As a result of NYCHA's conduct, Ms. Middleton was and remains liable for a rent in excess of the amount allowed under federal law for a period of eight months. She was at risk of eviction because of NYCHA's failure to properly calculate her monthly rent.

213.     Ms. Middleton's rent still exceeds the allowed amount and NYCHA failed to credit her several months of the child care expense deduction, among other miscalculations and overestimations.

214.     Ms. Middleton complied with the income recertification process and rules but she still received a CRD notice threatening the termination of her lease, putting her at risk of homelessness. Because of this threat, Ms. Middleton agreed to pay money that she does not owe to avoid risking losing the apartment where she and her family reside.

215.     Ms. Middleton suffered damages from the rent overcharge and emotional distress in an amount to be determined at trial.

36

*Thania Acosta*

216.    Thania Acosta is the tenant at 154 Avenue D, Apt. 4C, New York, New York, known as Jacob Riis Houses. She resides in public housing administered by the New York City Housing Authority, which determines her rent based on her income.

217.    Ms. Acosta has lived in her apartment for 10 years with her two children, one of which is autistic.

218.    Up to October 2018, Ms. Acosta's monthly rent of $1,039 was based on the following monthly household income: roughly $1,000 earned by Ms. Acosta; roughly $1,900 earned by Ms. Acosta's daughter; and Ms. Acosta's son's SSI payments of roughly $750.

219.    In October 2018, Ms. Acosta lost her job. Aside from two unemployment payments she received in or around November 2018, Ms. Acosta has been without an income from that time throughout the present day.

220.    Based on Ms. Acosta's job loss in October 2018, her monthly rent should have been adjusted to be no more than approximately $790 (without counting any applicable deductions). It was not so adjusted—to this day.

221.    As soon as Ms. Acosta lost her job in October 2018, she informed NYCHA. At that time, Ms. Acosta was the respondent on a housing court nonpayment proceeding under index no. 20511/2017. In a court in or around October 2018, Ms. Acosta informed the housing assistant and the judge of her job loss and she requested that her rent be reduced.

222.    One month after, Ms. Acosta uploaded documentation showing her job loss onto NYCHA's computer system, which constituted further notification to NYCHA of her income drop.

223.    Throughout most of the year 2019, the housing court case was repeatedly adjourned for Ms. Acosta's rent readjustment request to be processed by NYCHA. On every court date, Ms.

Acosta told the housing assistant and the judge that she was still waiting for her request to be processed.

224.    A repeated excuse proffered by NYCHA in court was that they were experiencing an "IT error" that prevented them from completing Ms. Acosta's request.  In a September 27, 2019 order, the court memorialized the housing assistant's admission to the effect that the rent adjustment "had been *delayed* because respondent never filed prior year's annual recert which required an override by IT" (emphasis added).

225.    Contrary to the housing assistant's representation, Ms. Acosta completed her 2018 annual recertification in November 2018.

226.    Two months later, in a November 26, 2019 order, the court stated: "NYCHA *admits* it could not make adjustment because the IT person assigned had a medical emergency of a family member. HA Hernandez is confident that IT will be able to reset her account quickly soon tho/ they are aware it *fell through [the] cracks*" (emphasis added).

227.    In January 2020, still without processing her rent readjustment, NYCHA evicted Ms. Acosta and her children. Ms. Acosta had missed a January 3, 2020 court date due to being hospitalized with asthma. Before she could recover sufficiently to head to court to file an order to show cause to reopen her case, NYCHA retained a marshal and evicted her.

228.    At that point, Manhattan Legal Services received Ms. Acosta's case referral, appeared on a post eviction proceeding, and won her restoration to her home.

229.    To this day, NYCHA has not reduced Ms. Acosta's monthly rent to account for her October 2018 job loss. To the contrary, in May 2020, inexplicably, NYCHA increased Ms. Acosta's rent from $1,039 to $1,578, effective September 2020. Ms. Acosta believes that NYCHA is

improperly counting as members of the household two of her children, even though they moved out of the home, and she apprised NYCHA of this, back in 2017.

230.    To this day, Ms. Acosta has been overcharged for over a year and a half. Her health has worsened and she attends therapy to deal with the anxiety cause by her dealing with NYCHA.

231.    Ms. Acosta suffered damages from the rent overcharge and emotional distress in an amount to be determined at trial.

## JURY DEMAND

232.    Plaintiffs demand a jury on all issues so triable.

## CLAIMS FOR RELIEF

## I. VIOLATION OF THE BROOKE AMENDMENT TO THE UNITED STATES HOUSING ACT

233.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

234.    By failing to timely and accurately perform mandatory interim adjustments of Plaintiffs' rent, and by persistently miscalculating Plaintiffs' rent both in the context of interim and annual reviews, Defendants have violated the Brooke Amendment to the U.S. Housing Act, 42 U.S.C. § 1437a, and its implementing regulations.

235.    As a result of Defendants' policies and practice, plaintiffs have suffered and continue to suffer damages, including the threat of eviction from their homes.

236.    A cause of action is created by 42 U.S.C. § 1983.

## II. VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT OF THE U.S. CONSTITUTION

237.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

238.    Defendants, by virtue of its policies and practices, have deprived Plaintiffs of due process of law by compelling them to pay rent in excess of federal limits without

adequate notice or a timely opportunity to be heard.

239.    As a result of Defendants' policies and practice, Plaintiffs have suffered and
continue to suffer damages, including erroneous deprivation of their benefits and
the threat of eviction from their homes.

240.    A cause of action is created by 42 U.S.C. § 1983.

## III. VIOLATION OF STATE LAW BASED ON NYCHA'S FAILURE TO FOLLOW ITS OWN WRITTEN POLICIES

241.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

242.    Plaintiffs seek a declaration pursuant to Article 30 of the New York Civil Practice
Law and Rules that Defendants have violated their own written policies and
procedures by failing to properly adjust plaintiffs' rent shares in a timely manner,
failing to set appropriate effective dates for the adjustments, failing to properly
issue retroactive rent credits, and failing to give Plaintiffs adequate written notice
of any and all final agency decisions.

243.    As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer
damages, including the threat of eviction from their homes.

### REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

1.    Enter a final judgment pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1337 of the

Federal Rules of Civil Procedure declaring that:

a)    Defendants' policy and practice of failing to timely process interim reexaminations
and set rents according to actual income both in the context of interim and annual
recertifications, compelling Plaintiffs to pay rents above federal limitations, violates

40

the Brooke Amendment to the United States Housing Act, 42 U.S.C. 1437a, and
its implementing regulations;

b)      Defendants' policy and practice of failing to timely process interim reexaminations
and set rents according to actual income both in the context of interim and annual
recertifications, compelling Plaintiffs to pay rents above federal limitations, without
adequate notice or a timely opportunity to be heard, violates the Due Process
Clause of the 14th Amendment to the United States Constitution;

c)      Defendants' failure to timely and properly adjust Plaintiffs' rent shares, set
appropriate effective dates for the adjustments, issue appropriate retroactive rent
credits, and provide written notice of agency final decisions, violates Defendants'
own written policies, in violation of State law;

2.      Preliminarily and permanently enjoin Defendants from enforcing the policies and
practices challenged in this action;

3.      Issue a preliminary injunction requiring Defendants to complete interim and annual
recertifications on a timely basis and properly set family shares, properly set the effective date of
the subsidy change, retroactively adjust subsidy payments, and properly provide written notice
with share calculations to Plaintiffs;

4.      Issue a permanent injunction requiring Defendants to develop a plan and
promulgate comprehensive procedures, satisfactory to this Court, to ensure that Defendants
comply with federal law and implementing regulations, and due process of law, with respect to
timely and accurate processing of interim and annual adjustments to participants' rents;

5.      Issue a permanent injunction directing Defendants to adjust Plaintiffs' rents
retroactive to reporting dates in compliance with federal law and implementing regulations;

6.      Award the Plaintiffs damages in an amount to be determined at trial;

7.      Award Plaintiffs costs and attorneys' fees incurred in the pursuit of this action; and

8.      Grant such other and further relief as this Court may deem just and proper.

Dated:   June 29, 2020
         New York, New York

                                   Respectfully,

                                   By: */s/ Luis A. Henriquez Carrero*

                                   **LEGAL SERVICES NYC**
                                   Rosalind Black
                                   Erica Braudy
                                   Iris Bromberg
                                   Tashanna Golden
                                   Luis A. Henriquez Carrero
                                   Edward Josephson
                                   Maura McHugh Mills
                                   Robert Sanderman
                                   Stacey Silliman

                                   *Attorneys for Plaintiffs*

                                   40 Worth Street
                                   Suite 606
                                   New York, NY 10013
                                   646-442-3600
                                   rblack@lsnyc.org
                                   ebraudy@lsnyc.org
                                   ibromberg@lsnyc.org
                                   tgolden@lsnyc.org
                                   lahenriquez@lsnyc.org
                                   ejosephson@lsnyc.org
                                   mmchugh@lsnyc.org
                                   rsanderman@lsnyc.org
                                   ssilliman@lsnyc.org